ELLIS, Judge.
This suit is the result of an intersectional collision which occurred on July 20, 1960 at approximately 10 A.M. on a clear day at the intersection of Evangeline Street and East Brookstown Drive in the Parish of East Baton Rouge, between an automobile being driven in an easterly direction on Evangeline Street by Mrs. Barbara Woods and in which the plaintiff, Mrs. Willie O. Waldrop, was a guest passenger in the front seat, and a Mercury Sedan being driven in a northerly direction on East Brookstown Drive by Mrs. Shirley Patterson Scott.
Mrs. Willie O. Waldrop filed suit for damages for personal injuries suffered as a guest passenger and her husband, J. E. Waldrop, sued for doctors’ charges, drugs, hospital and future medical and drug expenses, in the total sum of $1537.27.
The defendants in this suit are Mrs. Barbara Pittman Woods and her husband, Ronald G. Woods, and their insurer, Allstate Insurance Company, and Shirley Patterson Scott and her husband, Leo Scott, and their insurer, Grain Dealers Mutual Insurance Company. The defendants’ answer is a general denial of negligence on the part of the operators of the cars and a plea of contributory negligence as a bar to recovery by the plaintiff-guest-passenger.
The case was duly tried and the lower court rendered judgment in solido against all defendants in favor of the plaintiff, J. E. Waldrop, in the full sum of $783.61 together with interest at the rate of 5% per annum from date of judicial demand until paid, and in favor of the plaintiff, Mrs. Willie O. Waldrop, in the full sum of $2500.00, with interest at the rate of 5% per annum from date of judicial demand until paid, all costs, including expert witness fees for Dr. Daniel J. Fourrier in the amount of $75.00 and Dr. Chas. B. Cracraft in the amount of $50.00.
From this judgment the plaintiffs have appealed, asking for an increase in quantum. Allstate Insurance Company and its insureds also appealed asking that the judgment against those defendants be reversed. Grain Dealers Mutual Insurance Company and its insureds, Leo and Shirley Patterson Scott, have answered the appeal asking that the judgment be reversed as to them, and, alternatively, that the quantum be decreased.
It is shown by the record that Evangeline is a favored street and that traffic proceeding on East Brookstown Drive is required by a yield sign to honor traffic on the former street, and on the day in question Mrs. Barbara Woods was traveling in an easterly direction on Evangeline at a speed fixed by the testimony at from 25 to 35 miles per hour (speed limit 30 miles per hour) and as she approached the intersection of the two streets she saw the Scott car being driven at approximately thirty miles per hour in a northerly direction, prior to the time that it reached the yield sign. Assuming that it would honor her right of way and obey the law by yielding, she proceeded toward the intersection and just as she entered the inter-, section the plaintiff-guest-passenger and Mrs. Woods evidently saw the Scott automobile about the same time, and at that moment the plaintiff-guest-passenger testified that she screamed a warning. Mrs. Woods testified that when she saw the automobile just as she entered the intersection there was nothing that she could do to prevent the accident. The testimony establishes the point of impact between the vehicles as being four feet north of the south curb of Evangeline Street, eight feet west of--the' *108 east curb of East Brookstown Drive, eighteen feet south of the north curb of Evangeline, fourteen feet east of the west curb of East Brookstown Drive. The width of each of these two streets was approximately twenty-two feet.
Shirley Scott testified that she was driving approximately 25 miles an hour and that when she reached the intersection she had slowed down for the yield sign and was driving about ten or fifteen miles per hour. She was asked:
“Q. When you entered the intersection of Evangeline and Brookstown what happened?
“A. I pulled up to the yield sign, I mean, I saw the car coming, but I thought I had enough time to cross the street.”
It is also shown that there was a building on the southwest corner of the intersection which interfered somewhat with a view of the driver on Evangeline Street as well as the driver on East Brookstown Drive, however, we do not believe that this plays any material part in a decision in this case.
Without detailing the testimony in considering the negligence vel non of Shirley Scott, we are in agreement with the findings of the trial court in this respect as we believe the testimony convicts her of gross negligence in proceeding into the intersection in the face of an absolute collision, which she should have realized was inevitable. Had she yielded the right of way in accordance with the sign and the law there would have been no collision.
Counsel for plaintiffs in their brief charge Mrs. Barbara Pittman Woods with negligence contributing to the accident which consisted primarily, but not exclusively, of the following:
(a) She admitted she saw the other car but thought it would stop.
(b) She admitted she didn’t blow her horn.
(c) She admitted she didn’t put on her brakes.
(d) She admitted she didn’t attempt to avoid the collision by swerving or turning.
(e) She admitted she was driving 25-30 m. p. h. which was too fast for a blind corner.
(f) She admitted she didn’t react to the warning of her guest passenger.
(g) The extensive damage indicated considerable speed.
(h) She was driving too fast under the circumstances.
(i) She didn’t have her car under proper control.
(j) She had the last clear chance to avoid the collision.
We will take up the charges as set forth above.
(a) It is true that Mrs. Barbara Pittman Woods admitted that she saw the other car but assumed or thought that it would stop for the yield sign. Under the law Mrs. Woods had the legal right to assume that the Scott driver would obey the law and yield the right of way. She was under a legal duty to take action only when she could or should have realized that the Scott automobile was going to disobey the law and proceed into the intersection.
(b) It is also true that Mrs. Woods admitted she did not blow her horn. She was under no legal duty to blow her horn or warn the Scott driver until she realized or should have realized that the Scott vehicle was going to proceed into the intersection against the yield sign and the law, and according to the record this was not apparent until the Woods vehicle started to enter the intersection and at this time it was only 14 feet distant from the point of impact, while the Scott motor vehicle was only 4 feet from the same point. An inescapable emergency had been created by the failure of the driver of the Scott au *109 tomobile in yielding the right of way, and blowing her horn or (c), applying her brakes would have been futile and completely ineffectual as a means of avoiding the impending collision.
(d) While we do not believe that Mrs. Woods could have avoided the collision by swerving or turning, she was placed in an emergency created completely by the driver of the Scott automobile and she had only 14 feet in which to react and avoid the collision. There is no showing, either, that swerving would have avoided the collision.
(e) While she admitted that she was driving 25 to 30 miles per hour, and the plaintiff-guest-passenger testified that she told her, during the time the latter was in the hospital, that she was driving 35 miles an hour, we do not find any facts which would show that her speed at the time was the proximate cause of the accident. The corner was not entirely blind and this accident was due entirely to the failure of the driver of the Scott car to keep a proper lookout, which would have prevented the collision. The Scott automobile was driven toward the intersection at approximately 25 miles per hour and then slowed down to approximately 10 miles an hour just before it reached the yield sign, which would have been an invitation, even if Mrs. Woods had seen the car at that moment, for her to proceed on into the intersection upon the absolute assumption under the facts that the Scott driver was going to yield the right of way. However, Mrs. Woods had a right to assume, when she saw the car approaching at even 30 miles an hour prior to the time it reached the yield sign, that it would honor her right of way and obey the law. She was under no duty to continually keep her eyes to the right upon the Scott automobile as it approached the yield sign, as there was nothing unusual about its speed or the manner in which it was being driven which would serve as a warning that the operator was not going to obey the law and yield the right of way.
(f) The testimony shows that the warning of the plaintiff-guest-passenger was given at the same time that Mrs. Woods saw and realized the danger of the collision from the Scott car proceeding against the yield sign into the intersection, and at that time it was approximately 14 feet from the point of impact.
(g) We do not find any evidence of excessive speeds nor do we understand what counsel means by “considerable speed” in view of the positive testimony which fixed the approximate speeds of the two automobiles at 25 to 35 miles per hour. According to the record the speed limit was 30 MPH on these streets.
(h) We do not find that Mrs. Woods was driving too fast under the circumstances.
(i) There is nothing to indicate that Mrs. Woods did not have her car under proper control. No .one could have avoided this collision within 14 feet and the 4 feet which the Scott vehicle traveled into the intersection at the point of impact.
(j) There is no testimony to show that Mrs. Woods had the last clear chance to avoid this collision. She had a right to assume, when she looked and saw the Scott vehicle approaching at approximately 30 miles an hour being driven in a normal manner and at such a distance from the yield sign, that it would yield the right of way. There can be no doubt but that the Scott automobile could have obeyed the law and yielded the right of way from the point that Mrs. Woods saw it approaching at approximately 30 miles per hour, for Shirley Scott testified that she had slowed down to approximately ten miles an hour before entering the intersection.
We find no contributory negligence on the part of the plaintiff-guest-passenger, and she and her husband are entitled to recover from the defendants, Leo and Shirley Scott and their insurer, Grain Dealers Mutual Insurance Company.
*110 We find no negligence on the part of Mrs. Barbara Woods.
QUANTUM
As a result of the accident on July 20, 1960, the plaintiff was taken by ambulance to the emergency room of Our Lady of the Lake Hospital in Baton Rouge, Louisiana, where she was seen by her physician, Dr. Daniel J. Fourrier, who described her condition at the time of his arrival as being “quite upset, nervous, apprehensive. She complained of pain in her chest, left knee, both legs, left side of her mouth, her back and her neck.” The doctor gave the plaintiff a complete examination and found that she had a contusion of the right breast with subcutaneous bleeding underneath the tissues, and “contusions of the left upper chest wall; contusions of both legs, contusions of the left knee with extensive ec-chymosis (subcutaneous bleeding beneath the tissues) about the knee, particularly on the medial aspect.” He also found a laceration inside of the mouth with extensive hemorrhage resulting from a bite, strain of muscles in the neck, strain of the left knee; contusion of the right auxiliary region, and a lumbo sacral strain. Dr. Fourrier had the plaintiff moved to the hospital where she remained until her discharge on July 24, 1960. The doctor continued to see the plaintiff at fairly frequent intervals, varying from a week to two weeks apart. He was asked to review a little bit of the treatment and attention that he afforded Mrs. Wald-rop after she left the hospital and he answered: “Well, she continued to complain rather bitterly of her injuries. She was seen and subjectively treated for these, given sedation for relief of the pain, and instructed to use heat on the sore places and to rest. And she was given something to allay her nervousness. During this time there was considered to be a normal progressive healing process taking place.” Dr. Fourrier testified that prior to the accident he had been treating the plaintiff for nervousness and she was of a very nervous type, however, he was of the opinion that the accident and trauma had aggravated her nervous condition. It is apparent from the testimony that she complained a great deal of pain, for example, in the back of her head on the right side, which the doctor remembered “that I could find no objective evidence of any damage there.” On August 9th plaintiff went to the office of Dr. Four-rier and he recommended or instructed her to use traction which he stated was effective in relieving her neck pain and discomfort, “but I remember she complained of aggravation of the shoulder pain when she used the traction.” The plaintiff also complained of nausea and vomiting during the period of Dr. Fourrier’s treatment several times and when asked, “How severe was that ?” he answered, “well, I don’t believe I ever saw her when she vomited but I remember that she called several times and stated that she was vomiting and was unable to retain anything by mouth.” It was his opinion that the probable cause of this nausea and vomiting was probably tension and nervousness which he thought was aggravated by the injuries she had received. Dr. Fourrier stated that there was minimal swelling of all areas which she originally bruised, “of course, these subsided in time.” However, apparently the most serious injury which she suffered, as shown by the medical testimony, was to her left knee, and Dr. Fourrier stated that on a visit to his office on December 6, 1960 the left knee and entire left lower extremity was swollen from the knee on down and that he prescribed that plaintiff wear an elastic bandage on this leg until the swelling subsided and if it returned. The swelling in this leg remained for many months after the injury and Dr. Fourrier was of the opinion that plaintiff had incurred an injury to the vein on the left side of her leg in the region of the knee, and that she must have developed a deep vein thrombosis at the time of the accident or shortly after the accident, which he explained was a clot or what is commonly known as “milk leg”, and as a result of the “milk leg” there eventually is resolution of the clot but in the healing process valves of the deep veins are destroyed and the situation ensues which is *111 known as a post-thrombophlebitic syndrome, which is manifested by swelling that might come and go, depending upon the severity of the process. It was his opinion that the “milk leg” condition as the result of the thrombosis might be somewhat permanent for he stated that “she may have some trouble with it.” Plaintiff would complain to the doctor of swelling after a long automobile ride which he described as normal for her condition as the sitting still would cause the leg to swell due to changed circulation. Pie described her bruises and abrasions received in the accident as quite sore and tender to touch for some time but eventually they completely subsided. Dr. Fourrier testified as to the strain of the muscles in the back which he found upon his original examination as being accompanied by symptoms of pain in the neck “on both sides when moving the neck around, limitation of movement.” He would not testify that she had a whip lash injury as he stated “I don’t use that term.” During the time of his treatment of the plaintiff from the accident until December 16, 1960 she had made ten office visits and he had made three house visits. Dr. Fourrier was of the opinion that plaintiff had made a recovery from her injuries with the exception of the residual condition in her left lower extremity and he thought she had made a maximum improvement in that.
On cross examination Dr. Fourrier testified that he would not classify the plaintiff’s thrombophlebitis as serious or of a severe degree. He also testified that plaintiff had been under treatment prior to the accident for a nervous condition and a cardiac condition.
Dr. Fourrier also testified that during his treatment (August 9th, 1960 visit by plaintiff) he recommended that plaintiff see another doctor “because it seemed to me that she was complaining more than I could explain by physical examination at the stage at which she was in at the office when I recommended it.”
The plaintiff took the advice of Dr. For-rier and went to see Dr. Charles B. Cra-craft, an orthopedic surgeon, on August 12, 1960. Dr. Cracraft at that time reviewed x-rays that had been taken at Our Lady of the Lake Hospital during plaintiff’s hospitalization right after the accident. At the time she came to his office she was wearing an Ace bandage on her left knee and an inspection of this knee revealed slight generalized swelling with a bluish discoloration due to an old hemorrhage on the medial aspect, distal end of the left thigh and over the anterior portion of the proximal end of the lower leg. He found no instability of the collateral ligaments of the left knee but acute tenderness to pressure over the proximal and distal attachments of the medial collateral ligament. The left knee was 14 inches in circumference and the right knee 13(4 inches. An examination of the right shoulder at that time revealed that all motions were complete but she complained of pain on full flexion and full abduction. There were no point tender areas about the shoulder. There was tenderness to pressure over the anterior aspect of the upper right chest. No crepitation was felt. Inspection of the back revealed a bluish discoloration of the skin over the right posterior iliac crest. All motions of the back were complete but she complained of pain on assuming the upright position from the flexed position. There was no paravertebral muscle spasm present. In the sitting position, the legs could be completely extended without causing low back pain. In a supine position, the straight leg raising test was negative for low back pain. There was no weakness of dorsi flexion of either foot and no weakness of either Extensor Hallucis Longus Muscle. Plaintiff complained of tenderness to pressure over the low back. “Examination of the neck revealed that all motions were complete and apparently painless. There was no cervical muscle spasm present and no point tenderness about the neck.” His diagnosis at that time was as follows:
“A. Strain of the cervical musculature, subsiding; lumbo-sacral strain, subsiding; contusion of the right an *112 terior chest wall; contusion of the right shoulder, subsiding; strain of the medial collateral ligament, left knee; and contusion of the left knee.”
Dr. Cracraft recommended that plaintiff continue under the treatment of Dr. Fourrier and that she should be fitted with a left knee cage locked in 175° extension for the purpose of immobilizing the knee for three weeks and giving her a chance to recover from the injuries he thought she had sustained. He was of the opinion that she had had an injury to the ligament of the knee on the medial side as well as a braise. He next saw her on October 28, 1960 at which time she walked without a limp and with no clinical evidence of swelling of the left knee and the circumference of each knee was the same, and the motions of the left knee were complete. Her right shoulder could be put through a full range of motion but she did complain of slight discomfort on full abduction and flexion. He found no point tender areas about the shoulder, although she still complained of slight tenderness to pressure over the upper right chest anteriorly. He found motions of the neck and back were complete and there was no muscle spasm. He did not recommend any cervical traction, however, plaintiff told him that she was having such traction under Dr. Founder’s direction, “but I didn’t enter into that part.” tie prescribed injections of hydrocortone into the knee two or three times at weekly intervals and such treatment was carried out six times. He felt that the injections were beneficial and the plaintiff felt that they helped her. He continued to see the plaintiff after October 28th, 1960 as it was after this date that she received the injections. Fie saw plaintiff on May 5, 1961 and she was still having some pain and tenderness of the left knee which was more severe at times than others. He saw her again on June 13, 1961 at which time plaintiff told him that a few days prior to that her knee had been really swollen and he suggested that “she return when it was swollen so I could see it at the time.” lie was asked if he could give any medical reason for her continuing to have pain and tenderness in her left knee and in her left medial femural condyle for a period of almost ten months and he stated “I can’t give any anatomical reason, I believe that some people have a lower pain threshold than others, their symptoms last longer than others, but why, I cannot say.” On her last visit he was told by plaintiff of having made a trip to Oregon and having been hospitalized there and also about having the swelling at home on the 11th, two days prior to her office visit and Dr. Cracraft stated that there was no indication at the time of the office visit of the swelling that she had told him about. He stated under direct examination that he would not ordinarily expect swelling then, and that he could not definitely indicate about how much longer she might have some resulting discomfort or pain but that “I don’t really think it should be very long, but like I said, it has been longer than usual so I couldn’t set a date.” He did not think that the type of injuries which she had received would cause her to be bedridden as of the date he saw her on August 12, 1960. Neither did he think that her injuries would prevent her from walking around the house, although he readily stated that the injuries which he found on the date of his examination were painful.
We believe that Dr. Cracraft’s final opinions are well summed up under cross examination. Fie stated that he felt that plaintiff tended to exaggerate her symptoms and that approximately three months after the accident that she had apparently recovered from all injuries other than to her left knee and that as a result of his examination in May 1961 he was of the opinion that she did have some symptoms still in her left knee “but I did not think they were serious.”
There is no doubt that the plaintiff suffered painful injuries but the only residual is possibly and probably to the lower left extremity, that is, the thrombophlebitis. She was an extremely nervous person apparently from the testimony and was being *113 treated prior to the date of the accident, however, this condition was undoubtedly aggravated by the accident. Evidently the District Court was not impressed with the testimony of plaintiff and members of her family as to her subjective symptoms or complaints in view of the medical testimony that she exaggerated her symptoms and that Dr. Founder had recommended another doctor because he could find no justification for her complaints, as of approximately August 9, 1960.
We believe it is clear from the medical testimony that plaintiff’s injuries were of a minor nature except for the injury to the left knee and leg, which possibly left her with a condition that might flare up or give her trouble again.
We have been cited to many cases by counsel for plaintiff in which the awards range from $3500.00 to $10,000.00, and to jurisprudence by counsel for the defendants in which the awards range from $500.00 to $2500.00. Counsel for plaintiff forcefully argues that the present award is manifestly inadequate, whereas counsel for defendants argues that it is manifestly excessive and should be reduced to $1500.00.
We have examined these cases and agree with counsel for the plaintiff that the award should be increased. Considering plaintiff’s nature of extreme nervousness and that such a condition possibly caused her greater anxiety and worry and possibly pain than would be true of a normal person under the same stress and strain, and the permanent residual condition which can flare up or cause her trouble in the future we believe that the award should be increased to $3500.00 and it is so ordered.
There is no question raised as to the judgment in favor of plaintiff’s husband and it is hereby affirmed.
For the above and foregoing reasons the judgment of the lower court is hereby amended by increasing the award to Mrs. Willie O. Waldrop to the sum of $3500.00 and as amended it is hereby affirmed.
Reversed in part; amended and affirmed in part.
PER CURIAM.
It having come to the Court’s attention that the judgment in this case through in-advertance is not complete, the Court does now ex propria motu correct and complete the judgment as follows:
For the above and foregoing reasons, the judgment of the Lower Court is hereby set aside, annulled and reversed insofar as Mrs. Barbara Woods and Allstate Insurance Company are concerned.
It is now ordered, adjudged and decreed that there be judgment dismissing the plaintiffs’ suit against the said Mrs. Barbara Woods and Allstate Insurance Company.
It is further ordered, adjudged and decreed that the judgment in favor of Mrs. Willie O. Waldrop and against Leo Scott,. Shirley Patterson Scott and Grain Dealers Mutual Insurance Company be increased to the sum of $3500.00 and as thus amended it is hereby affirmed.